******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MULLINS, J., with whom KAHN and ECKER, Js., join, concurring in part and dissenting in part. I agree with and join part I of the majority opinion, but I respectfully disagree with part II of the majority opinion.

I

The majority's decision is based on the premise that, "[w]hen, as in the present case, there has been no finding of parental unfitness or abuse or neglect, it is inappropriate to afford the child's general interest in safety equal weight to the shared constitutional interest in family integrity." From this premise, the majority concludes that the constitutional presumption that guardianship should be reinstated in the parent must be overcome by clear and convincing evidence that reinstatement is not in the best interests of the child. I would conclude, consistent with our prior case law, that children have independent interests in safety *and stability. In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 287, 455 A.2d 1313 (1983) ("The child, however, has two distinct and often contradictory interests. The first is a basic interest in safety; the second is the important interest . . . in having a stable family environment." (Emphasis omitted.)). Therefore, it is not only the child's general interest in safety that is appropriate to consider, but the important interest of stability must also be considered. Thus, I fundamentally disagree with the majority's premise and conclusion.

I believe that it is not only appropriate, but required, for a trial court to take into account the interests of both the parent and the child in family integrity and the additional interests of the child in safety and stability, even when there has been no finding of parental unfitness. In my view, it does not follow that, in the absence of findings of parental unfitness or abuse or neglect, the interests of the parents and of the child are *ipso facto* aligned. Indeed, there may be no finding of parental unfitness; nevertheless, a child may not be safe or feel safe in that parent's care.

In a reinstatement proceeding, the child has had guardianship transferred to another person, either voluntarily or involuntarily, for some period of time. Typically, that child has started to form bonds with his or her day-to-day caretakers while out of his or her parents' care. In this very case, at the time the trial court denied the motion of the respondent, Kristi F., for reinstatement of guardianship, the child had been out of his parent's care for approximately five years of his seven year life. During this time, multiple attempts at reunification proved unsuccessful due to the respondent's inability to prioritize the child's emotional and physical health. It is this period of separation of the family unit

that gives rise to the need to consider the child's independent interests in safety and stability, separate from the parent's and the child's shared right to family integrity. Indeed, the longer the period of separation and the stronger the bonds the child makes with his or her caregiver, the more the interest of the child in stability may diverge from the interests of the parents. I do not mean to suggest that the parent's interests are unimportant, only that the child's interests are also significant and may diverge from those of the parent during that period of separation.

It is imperative for the trial judge not to presume that the interests of the parents and the child align—and thus the child's right to safety is somehow less important, as the majority posits—simply because there is no finding of parental unfitness. Rather, the trial judge should consider the equally important interests the child has in safety and stability when determining what disposition is in the best interests of the child. The constitutional presumption that reinstatement is in the best interests of the child adequately protects the right to family integrity. Requiring that presumption to be overcome by the heightened, clear and convincing evidence standard does not adequately protect the child's potentially divergent interests in safety and stability in a reinstatement proceeding. Therefore, I would conclude that, combined with the presumption that reinstatement of guardianship to the parents is in the best interests of the child, the fair preponderance of the evidence standard properly balances the interests of the parents and the child. Accordingly, I would affirm the judgment of the Appellate Court.

## II

Although I generally agree with the facts as presented in the majority opinion, I summarize the relevant facts and procedural history here to provide background to my opinion. Zakai F. was born in early 2011 and resided with his mother, the respondent, for approximately two years. In 2013, the respondent and the petitioner, Nikki F., who is the respondent's sister and Zakai's maternal aunt, agreed that the petitioner would care for Zakai.

In early 2014, the respondent reassumed custody and care of Zakai. Shortly thereafter, the respondent's live-in boyfriend, Montreal C., physically assaulted and seriously injured Zakai. Montreal was ultimately prosecuted for the assault. See *In re Zakai F.*, 185 Conn. App. 752, 756, 198 A.3d 135 (2018).

After Zakai's assault, the respondent agreed that Zakai again would stay with the petitioner. About four or five days later, the respondent requested that the petitioner return Zakai to her care. The petitioner did not return Zakai and instead filed a petition for immediate temporary custody and an application for removal of guardianship in the Probate Court, alleging that, even

after a restraining order was issued, barring Montreal from contact with Zakai and prohibiting him from being at the respondent's home, Montreal continued to live at the respondent's home. The petitioner further alleged that the respondent had been involved with the Department of Children and Families (department) in 2009 because the respondent's eldest daughter had died from injuries caused by the daughter's father. The Probate Court issued an ex parte order granting the petitioner immediate temporary custody of Zakai, but the court did not rule on the petitioner's motion for removal of guardianship. As a result, Zakai continued living with the petitioner.

Subsequently, the case was transferred to the family division of the Superior Court. On September 29, 2014, by agreement of the parties, the court ordered that (1) a guardian ad litem be appointed for Zakai, (2) the respondent continue to engage in anger management counseling, therapy, and parenting classes, and (3) the respondent be afforded supervised visitation with Zakai. Thereafter, the case was transferred to the juvenile division of the Superior Court in New Haven. That court allowed for unsupervised visits between the respondent and Zakai and increased the length of Sunday visits from two to four hours.

Then, in March, 2016, the attorney for Zakai filed an ex parte motion to suspend unsupervised visitation. The attorney for Zakai alleged, as grounds for the motion, that the respondent and Montreal had been arrested on felony charges.[1] The trial court granted the ex parte motion, thereby suspending unsupervised visitation.

In September, 2016, prior to a scheduled hearing on the respondent's motion to vacate the order of immediate, temporary custody and the petitioner's motion to transfer guardianship, the court accepted and approved an agreement resolving all outstanding issues. Pursuant to this agreement, the court transferred guardianship of Zakai to the petitioner, ordered unsupervised daytime visits between the respondent and Zakai, and ordered that, until the protective order was resolved or modified; see footnote 1 of this opinion; the petitioner would have a third party present in her home while exchanging custody of Zakai with the respondent. The stipulation also required that any further expansions of the visitation schedule, including overnight visits, would be arranged through family therapy.

Thereafter, in 2017, the respondent filed a motion to reinstate her guardianship rights to Zakai and one for overnight visitation. After a hearing, in December, 2017, the court issued its order and "elected to hold in abeyance any definitive ruling on the motion to reinstate the respondent's guardianship rights and instead ordered that Zakai immediately commence overnight visits with the respondent. The court further ordered

that the respondent exclusively was to care for Zakai during the overnight visits and that there was to be no contact between Zakai and any unrelated male adults." Id., 758.

In making its December, 2017 ruling to commence overnight visits with the respondent, the trial court explained: "Clearly, up until the last [one and one-half years], [the respondent] has struggled to achieve and sustain a lifestyle conducive to having Zakai return to her care. It took her a long time, and some would argue too long, to disengage from [Montreal]. But she appears to have permanently done so for [more than one] year now. The remaining obstacle—one of the remaining obstacles—that needs to be navigated now is whether [the respondent's] choices . . . [including whom she allows to care] for and to have contact with [Zakai], are sound and safe choices. . . . The terrible, heart-breaking death of [the respondent's] eldest infant daughter, who died while [the respondent] left [her] in the . . . care [of the child's father] and then, subsequently, Zakai's beating by [Montreal], again a caregiver chosen by [the respondent] when she went to work to pay the bills. These traumatic, tragic events occurred due in large part to choices and exercises in judgment by [the respondent]. Zakai cannot afford to have history repeat itself. . . . [The respondent] must understand that the court, in its orders today, is trying to facilitate the strengthening of the mother-child bond but at the same time ensure that Zakai remains safe, both physically and emotionally." (Internal quotation marks omitted.)

Thereafter, the respondent and Zakai began to have weekend, overnight visits, in addition to Tuesday visits. The overnight visits initially consisted of one overnight and then, in January, 2018, the overnight visits extended from Friday, after school, through midday Sunday.

Less than two months after unsupervised, overnight visits commenced, on February 2, 2018, counsel for Zakai filed a motion to suspend overnight visitation. As grounds for the motion, counsel represented that Zakai reported that the respondent allowed an unrelated male to be in the home during Zakai's overnight visits, in violation of the explicit terms of the December, 2017 order.[2] Counsel for Zakai also represented that Zakai reported to his therapist that the respondent had hit him and his sister, that Zakai reported to the petitioner that the respondent told him not to tell anyone about a male being in the home during his overnight visits, and that Zakai stated that he did not want to continue having overnight visits with the respondent.

On February 15, 2018, the court reconvened the proceedings to hear testimony and to receive other evidence regarding both the motion filed by the counsel for Zakai to suspend overnight visitation and the respondent's June, 2017 motion to reinstate her guardianship

rights. The court heard additional testimony from numerous witnesses on February 15, February 28, and March 1, 2018.

On March 1, 2018, the court issued its memorandum of decision. The trial court found that "the reasons and events that prompted the agreed to 2016 transfer of guardianship have been sufficiently ameliorated. [The respondent] is capable of providing Zakai with appropriate housing, nutrition and clothing, and she is capable of meeting his educational, medical and physical safety needs. [The respondent] and Zakai share a loving parent-child like bond and, when [Zakai] feels he is in a safe environment, [the respondent] and [Zakai] enjoy quality time together." (Footnote omitted.) The court then explained that "[t]he more daunting issue is determining what is now in Zakai's best interests."

The court explained that, in December, 2017, "progression to overnight visits appeared to be in Zakai's best interest[s]. And, although some period of adjustment to spending overnights with [the respondent] may have been foreseeable, the emotional and physical debilitation Zakai is now exhibiting is unacceptable." As the majority notes in its opinion: "[T]he court credited the testimony of Zakai's first grade teacher, Zakai's therapist, and the petitioner. Each of these witnesses testified that, on days that Zakai is scheduled to visit with the respondent, he demonstrates regressive, debilitating behavior, and that there has been a dramatic negative change in his behavior since the commencement of overnight visits with the respondent."

The court recognized that, "[c]ommencing in February, 2014, [the respondent] has remained steadfast in her efforts to have Zakai return to her care . . . [and that] [a]ll of [the respondent's] laudable accomplishments obviously factored heavily into [the] court's December, 2017 order to immediately commence [overnight visits]." Nevertheless, the court explained: "The difficulty, sadly, is that the court's December, 2017 orders are subjecting Zakai to unjustifiable and debilitating emotional stress. . . . Zakai loves [the petitioner] and [his] cousins, and [the petitioner] is a mother figure to Zakai and his cousins are like siblings to him. Zakai acknowledges [the respondent] as his mother, and there is a parent-child like bond, but it is hampered by the reality that Zakai does not feel safe and secure in [the respondent's] care. Over years of contact and visits, with the gradual increase in the amount and degree of contact between [the respondent] and [Zakai] and [by] reintroducing Zakai to [the respondent's] home and the people important to [the respondent], it was assumed [that] Zakai would achieve an adequate sense of safety and security when with [the respondent]. Unfortunately, he has not. To the contrary, by increasing Zakai's time in [the respondent's] care and having [overnight visits] in [the respondent's] home, Zakai feels

less safe. . . . Proverbially speaking, Zakai is scream-ing for permanency; he wants and needs to know his one 'forever' home." (Footnotes omitted.) The court, therefore, concluded that it was not in Zakai's best interests to return to the respondent's care and, accord-ingly, denied the respondent's motion for reinstatement of guardianship and granted the motion filed by the attorney for Zakai to terminate overnight visits.

These facts highlight the divide between my position and the majority's position. The fact that there is no finding of unfitness simply does not mean that the inter-ests of the respondent and of Zakai are aligned. The court's specific finding that Zakai does not feel safe in the respondent's care supports the conclusion that their interests are not aligned. It is the fact that these separate interests exist that leads to my view that both interests must be taken into account. I agree with the majority that the shared interest in family integrity is why there should be a presumption in favor of reinstatement. Where I part ways with the majority is over what stan-dard of proof must be met in order for the nonparent to rebut the presumption.

### III

I agree with the majority that the question of the appropriate standard of proof to be applied requires a balancing of the three "factors identified in [*Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)] to determine whether a particular standard of proof in a particular proceeding satisfies due process." *Santosky* v. *Kramer*, 455 U.S. 745, 754, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Namely, we must consider "the private interests affected by the proceeding; the risk of error created by the [s]tate's chosen procedure; and the countervailing governmental interest supporting [the] use of the challenged procedure." Id.

### A

Like the majority, I first consider the private interests affected by the proceeding. In a proceeding concerning the reinstatement of guardianship, there are two private interests at stake—those of the parent and those of the child. Both must be accounted for in deciding which standard of proof should apply.

On the parental side, it is well established that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the funda-mental liberty interests recognized by [the United States Supreme Court]." *Troxel* v. *Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Indeed, it is this fundamental right of parents to the care, custody and control of their children that the majority and I recognized by adopting the presumption that reinstate-ment of guardianship is in the best interests of the child.

"It must be stressed, however, that the right to family integrity is not a right of the parents alone, but encom-

passes the reciprocal rights of both [the] parents and [the] children. It is the interest of the parent in the companionship, care, custody and management of his or her children . . . and of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association . . . with the parent . . . ." (Citations omitted; internal quotation marks omitted.) *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 284; see also *Smith* v. *Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 844, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977) ("the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children").

On the child's side, more specifically, this court has explained that "[t]he child . . . has two distinct and often contradictory interests. The first is a basic interest in safety; the second is the important interest . . . in having a stable family environment." (Emphasis omitted.) *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 287.[3] If the family is intact, a child's interest in having a stable family environment often aligns with a parent's right to the care, custody and control of his or her child. Once a family is not intact, however, as is the case in a reinstatement proceeding, the parent's right to family integrity and the child's right to stability are not always or necessarily aligned.

The very nature of a proceeding for reinstatement of guardianship necessarily involves a situation in which a parent has not been the primary caretaker for the child for some period of time. Often times, as in the present case, the child has been living outside of his or her parent's care for a lengthy period of time. It is, therefore, likely that, during that period of time, the child has established emotional connections and bonds with the individual who has been providing daily care to the child and to whom guardianship was transferred. It is also likely that the longer the child is apart from his or her parent, the more that his or her interests may diverge from that of the parent. As the United States Supreme Court has explained, "[n]o one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of [a] blood relationship." *Smith* v. *Organization of Foster Families for Equality & Reform*, supra, 431 U.S. 844; see also *Roth* v. *Weston*, 259 Conn. 202, 225, 789 A.2d 431 (2002) ("[w]e can envision circumstances in which a nonparent and a child have developed such substantial emotional ties that the denial of visitation could cause serious and immediate harm to that child").

My position should not be understood as minimizing parental rights. Indeed, I agree with the majority that

the presumption that reinstatement of guardianship is in the best interests of the child is warranted precisely because of the importance of parental rights and family integrity. I recognize, however, that this court has previously explained that, although "the rights of parents qua parents to the custody of their children is an important principle that has constitutional dimensions . . . we recognize that even parental rights are not absolute. We must reject the claim of the so-called 'parental rights' theory under which 'the parent has rights superior to all others except when he is proved unfit.' H. Clark, Law of Domestic Relations [(1968) § 17.5, p. 591]." (Citations omitted.) *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 661, 420 A.2d 875 (1979). This court has also explained: "If, for example, there has been an unusually protracted period of separation between [the] parent and [the] child, even a fit parent may possibly be found to have contributed to or acquiesced in a situation in which custody must be yielded to another." Id.

"It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or [other caretakers]. There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current 'home' . . . especially when such uncertainty is prolonged." *Lehman ex rel. Lehman* v. *Children's Services Agency*, 458 U.S. 502, 513–14, 102 S. Ct. 3231, 73 L. Ed. 2d 928 (1982). Relying on this principle, the Supreme Court of California explained: "The child has a liberty [interest] . . . in a normal family home . . . with his parents if possible . . . or at least in a home that is stable . . . . This concern has been characterized as important . . . and even compelling . . . ." (Citations omitted; internal quotation marks omitted.) *In re Sade C.*, 13 Cal. 4th 952, 988, 920 P.2d 716, 55 Cal. Rptr. 2d 771 (1996), cert. denied sub nom. *Gregory C.* v. *Dept. of Children's Services*, 519 U.S. 1081, 117 S. Ct. 747, 136 L. Ed. 2d 685 (1997).

Notwithstanding the foregoing recognition by this court and other courts that a parent's rights are not absolute, especially when there has been a protracted period of separation, the majority concludes that the child's interests should not be given equal weight to the parent's interest in family integrity. This view neglects the perspective of the child and the child's experience during the separation. Instead, I rely on the principle that this court has long adhered to, namely, "that parents have no natural right to the custody of their children that can prevail over a disposition [a]ffecting the child's best interests . . . ." (Citations omitted.) *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 659–60.

The facts of the present case demonstrate why recognition of the child's independent right to safety and

stability in the emotional attachments that the child has formed through daily association is essential in the context of reinstatement of guardianship. Here, Zakai, who was only seven years old when the trial court denied the respondent's motion for reinstatement of guardianship, had been in the care of the petitioner for approximately five years. The trial court found that Zakai viewed the petitioner as a mother figure and viewed the cousins with whom he lived as siblings. The trial court found that "to abruptly remove [Zakai] from [the petitioner's] care and home . . . would be cruel, [and would] inflict devastating loss and pain on Zakai . . . ."[4]

I would conclude that the preponderance of the evidence standard allows a trial court, when faced with a motion for reinstatement of guardianship under General Statutes § 45a-611,[5] to more fairly recognize the rights of the child and to give those rights the appropriate consideration in determining best interests. See *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 298–99 (recognizing that right of parents to family integrity and child's interests in family integrity and safety are "in relative equipoise" in temporary custody proceedings).

Having established that the rights of the parent and the child are at stake in a proceeding to reinstate guardianship, I must also consider the permanency of the loss threatened by the proceeding. I recognize that the denial of a motion for reinstatement of guardianship deprives the parent, for the duration of the guardianship, of the fundamental right to "the companionship, care, custody, and management of his or her children . . . ." *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). This deprivation is by no means insignificant. Unlike a petition for termination of parental rights, however, when the clear and convincing evidence standard applies, and the "[s]tate has sought not simply to infringe upon [the parents' rights to their child], but to end it," failure to reinstate guardianship is not permanent. *Lassiter* v. *Dept. of Social Services*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981); see also *Santosky* v. *Kramer*, supra, 455 U.S. 759 ("[f]ew forms of state action are both so severe and so irreversible" as termination of parental rights).

Indeed, an order temporarily removing a parent as guardian under General Statutes § 45a-610 or by stipulated agreement, as in the present case, is neither final nor irrevocable. Instead, it is reviewable upon petition by the parent for reinstatement of guardianship pursuant to § 45a-611.[6] That is precisely what happened here; a procedure that would have been unavailable if the parent's rights had been terminated. Moreover, there are no express restrictions in § 45a-611 limiting how often a parent may petition for reinstatement. Thus, the denial of the motion to reinstate guardianship does not terminate a parent's parental rights; nor does it preclude

the parent from filing another motion to reinstate in the future.

This court has repeatedly explained that a preponderance of the evidence standard is acceptable in nonpermanent custody proceedings. For example, this court has "concluded that a fair preponderance of the evidence is the [correct] standard of proof for a neglect petition because any deprivation of rights [at that stage] is reviewable and nonpermanent and, thus, warrants a slightly less exacting standard of proof." (Internal quotation marks omitted.) *In re Shamika F.*, 256 Conn. 383, 401 n.22, 773 A.2d 347 (2001).

In a similar context, this court also has explained that an award of temporary custody "represents a lesser intrusion into familial relationships than does the termination of parental rights because it does not result in a final and irrevocable severance of parental rights or 'a unique kind of deprivation' that forces parents to confront the state in a termination proceeding." *Fish* v. *Fish*, 285 Conn. 24, 72, 939 A.2d 1040 (2008); see also *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 299–300 (concluding that fair preponderance of evidence standard was appropriate because, in part, orders contemplated by abuse and neglect custody proceedings are reviewable upon petition for revocation of custody, and, thus, there is lesser deprivation of parent's rights than in termination proceeding).

The majority cites to a number of cases in which the clear and convincing standard was used in civil cases and concludes that "[i]t would strain rationality if a parent could lose her constitutional right to parent her child by a mere preponderance of the evidence when a party must prove fraud for the purpose of recovering monetary damages, or a lawyer's ethical lapse—claims certainly less weighty than the fundamental right to parent a child—by a heightened, clear and convincing standard." I disagree.

First, because the denial of reinstatement of guardianship is not permanent, a parent's rights are not lost. Indeed, as I explained previously in this opinion, orders of temporary custody and neglect petitions involve taking a child out of a parent's care, and the preponderance of evidence standard is used, not the clear and convincing evidence standard. Second, the presumption that reinstatement is in the best interests of the child is not insignificant. It is a presumption that does not exist in any of the civil cases to which the majority points. Third, and perhaps most significant, the child's interests in and right to safety and stability makes the majority's analogy to other civil cases that apply the clear and convincing standard an inept comparison. If the child's interests were not appropriate to consider, when, as in the present case, there has been no finding of parental unfitness, I might agree with the majority that the clear and convincing evidence standard should apply. How-

ever, in my view, the child's interests are undoubtedly an important consideration, even when the parent seeking reinstatement has not been deemed unfit. Thus, the preponderance of the evidence standard, which allows the court to more fairly consider the child's separate right to safety and stability in the day-to-day relationships he or she has formed, particularly after a protracted period of separation from the parent, is the appropriate standard.

In sum, a reinstatement of guardianship proceeding is a situation in which the guardianship of the child already has been vested in someone other than the parent for a period of time. Given the potentially diverging private interests of both the parent and the child that are at stake, and the nonpermanent nature of the deprivation that occurs in a reinstatement proceeding, I would conclude that this factor weighs in favor of a conclusion that proof by a preponderance of the evidence is the appropriate standard.

B

I next consider the second factor in the *Eldridge* balancing test. Ultimately, the question is whether the fair preponderance standard fairly allocates the risk of an erroneous finding regarding the child's best interests between the parties whose interests are at stake—the parent and the child. See *Santosky* v. *Kramer*, supra, 455 U.S. 761.

As I explained in part I of this opinion, I would conclude that both the parent and the child have compelling and sometimes diverging interests to be protected in a proceeding to reinstate guardianship. In considering whether a fair preponderance of the evidence standard fairly allocates the risks, I am mindful that the majority concludes that a parent is entitled to a constitutional presumption that reinstatement of guardianship to the parent is in the best interests of the child. Thus, the presumption and the resulting burden shift to the party opposing reinstatement already recognizes the parent's rights.

The majority goes even further in protecting the parent's rights, equating the interests of the respondent in the present case with that of a "fit parent." I disagree that the concept of a "fit parent" is applicable to the present case. The cases in which we have recognized the concept of a "fit parent" involve *intact* families in which the parent had custody and guardianship of the child but was trying to defend the intact family against action by an outside party.

For instance, in *Roth* v. *Weston*, supra, 259 Conn. 202, a father who had custody and guardianship of his minor children appealed from the judgment of the trial court granting visitation to the children's maternal grandmother and aunt, against his wishes. See id., 204–206. This court concluded that visitation over the objection

of a fit parent may be allowed only when a third party can demonstrate "that the parent's decision [denying] visitation will cause the child to suffer real and substantial emotional harm . . . provided the petitioner has established a parent-like relationship with the child." Id., 226.

*Roth* dealt with a fit parent in an intact family. The calculus is different when we are dealing with a family that is not intact. As noted previously, this court has stated that, when there is a protracted period of separation, "even a fit parent may possibly be found to have contributed to or acquiesced in a situation in which custody must be yielded to another." *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 661. Thus, I would conclude that, although a court will consider the fitness of the parent in determining whether reinstatement is in the best interests of the child, the concept of a fit parent insofar as it presumes that the rights of the child and parent are aligned is not applicable in reinstatement of guardianship proceedings.

The California Court of Appeal rejected a similar claim regarding parental fitness, explaining: "[A] parent's constitutional right against judicial interference with the parent's day-to-day child rearing decisions applies to a fit parent who has custody of the child. Here, the parents did not have custody of the minor; a guardianship had been established, and the guardians had provided the minor with day-to-day custody and care for several years. Because the parents were not participating in the day-to-day parenting of the minor, they were not entitled to the constitutional protection afforded to parents acting in that role. The test for determining whether to terminate the guardianship was the best interest of the child. Substantial evidence supports the trial court's decision that to terminate the guardianship would have been detrimental to the minor and, thus, not in her best interest." *Guardianship of L.V.*, 136 Cal. App. 4th 481, 484, 38 Cal. Rptr. 3d 894 (2006).

This court has also long recognized that the rights of a fit parent are not absolute. "It is well established as a general rule that the welfare and best interests of the child are controlling elements in the determination of all disputes as to the custody; and the statutes recognizing a right to the custody of the child in either the father or [the] mother must stand aside [when] the recognition of such a right would materially interfere with the paramount right of the child to have [his or her] welfare considered and conserved by the court. The welfare of the child under the [foregoing] rule may require that [his or her] custody be denied the parent and awarded to others." (Internal quotation marks omitted.) *In re Appeal of Kindis*, 162 Conn. 239, 242–43, 294 A.2d 316 (1972).

"Determining the best interest of the minor does not

necessarily require a finding that the parent is unfit." *In re Guardianship of Barros*, 701 N.W.2d 402, 408 (N.D. 2005), overruled on other grounds by *In re G.L.*, 915 N.W.2d 685 (N.D. 2018). Of course, this makes sense, and the present case is nearly a paradigmatic example of why. Here, although there was no finding that the respondent was unfit, the trial court made findings on the basis of the evidence that "Zakai acknowledges [the respondent] as his mother, and there is a parent-child like bond, but it is hampered by the reality that Zakai does not feel safe and secure in [the respondent's] care." (Footnote omitted.) The trial court also found that Zakai was being subjected to "unjustifiable and debilitating emotional stress" with increased overnight visitations with the respondent. Thus, notwithstanding the fitness of the parent, in the best interests analysis, we must account for the rights of the child, lest we risk subjecting children, like Zakai, to "unjustifiable and debilitating emotional stress."

Indeed, the statutory framework established by the legislature in § 45a-611 demonstrates that the legislature realized that, even if a parent has resolved the issues that caused guardianship to be placed with another individual, that does not end the inquiry. The court nevertheless must still determine ultimately whether reinstatement is in the best interests of the child. See General Statutes § 45a-611 (b). In doing so, our courts cannot ignore the mandates of the statute and our prior case law, which require consideration of the rights of the child.

The majority also relies on the fact that the transfer of guardianship in the present case was voluntary and, therefore, that we should require a higher standard of proof to rebut the presumption that reinstatement of guardianship is in the best interests of the child. I disagree. The statutory scheme of § 45a-611 does not provide for one standard of proof to be used when a transfer of guardianship is voluntary and another standard of proof to be used when a transfer of guardianship is not voluntary. To the contrary, the legislature adopted one statutory scheme, regardless of whether the transfer of guardianship was voluntary or involuntary.[7] That statutory scheme provides that guardianship should be reinstated only if the parent has ameliorated the reasons that caused the transfer of guardianship and *if reinstatement of guardianship is in the best interests of the child.* See General Statutes § 45a-611 (b). Accordingly, I would not adopt a heightened standard of proof for § 45a-611 based on the fact that the respondent in the present case agreed to the transfer of guardianship.

C

Finally, I consider "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews* v.

*Eldridge*, supra, 424 U.S. 335. This court previously has recognized the state's "continuing parens patriae interest . . . in the [well-being] of children . . . ." *In re Juvenile Appeal (83-DE)*, 190 Conn. 310, 318–19, 460 A.2d 1277 (1983).

Adopting a presumption in favor of reinstating guardianship rights to the parent while allowing the presumption to be rebutted by a preponderance of the evidence serves to strengthen the family while also protecting children. The presumption the majority adopts in part I of its opinion operates to shift the burden of production and persuasion to the nonmoving party once a parent has demonstrated that the reasons for transfer of guardianship have been ameliorated. This burden shift is a significant procedural protection for parents. If we were to adopt the presumption in favor of reinstating guardianship rights to the parent while allowing the presumption to be rebutted only by clear and convincing evidence—the most exacting civil standard of proof—it would unduly favor the rights of the parent over the rights of the child. This court has explained: "Where two important interests affected by a proceeding are in relative equipoise, as they are in [a temporary custody proceeding], a higher standard of proof would necessarily indicate a preference for protection of one interest over the other. . . . We see no reason to make such a value determination . . . ." (Citation omitted.) *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 298–99.

A review of case law from other jurisdictions reveals that other courts have also determined that a preponderance of the evidence is the correct standard to be applied to rebut a presumption in favor of reinstatement of guardianship. Indeed, the Colorado Supreme Court explained: "We are persuaded . . . that the *Troxel* [v. *Granville*, supra, 530 U.S. 57] presumption and the court's statutory role in considering what is in the child's best interests can be accommodated through the guardian bearing the burden of proof by a preponderance of the evidence." *In re D.I.S.*, 249 P.3d 775, 786 (Colo. 2011); see also *In re Guardianship of David C.*, 10 A.3d 684, 686 (Me. 2010) ("although a parent seeking to terminate a guardianship in order to regain custody bears the burden of proving that termination is in his or her child's best interest . . . the party opposing the termination of the guardianship bears the burden of proving, by a preponderance of the evidence, that the parent seeking to terminate the guardianship is currently unfit to regain custody of the child"); *In re Guardianship of Barros*, supra, 701 N.W.2d 409 (concluding that "evidentiary burden placed on the nonparent . . . is a preponderance of the evidence" in termination of guardianship proceeding).[8]

The preponderance of the evidence standard ensures that the proceeding is conducted fairly by giving suffi-

cient weight to the child's interests and by evenly allocating the risk of an erroneous determination by balancing the presumption that reinstatement is in the best interests of the child with a lower standard of proof to overcome the presumption. The standard also appropriately reflects the fact that the threatened loss is not permanent. There is no indication that the fair preponderance standard would increase the fiscal burden on the state in light of the fact that courts in this state are already familiar with the fair preponderance standard in family law cases.

I also disagree with the position of the respondent and the majority that allowing a party to rebut the presumption that reinstatement of guardianship to the parent is in the best interests of the child by a preponderance of the evidence does not sufficiently protect the presumption. As Justice Borden explained in his concurring opinion in *Ireland* v. *Ireland*, 246 Conn. 413, 717 A.2d 676 (1998), applying a preponderance of the evidence standard is sufficient in a burden shifting scheme. See id., 441–42 (*Borden, J.*, concurring). In responding to criticism that "the burden allocation scheme [adopted in that case] will be dispositive only in those relatively rare cases in which the evidence adduced regarding the best interests of the child with respect to relocation is in equipoise"; (internal quotation marks omitted) id., 441 (*Borden, J.*, concurring); Justice Borden explained that "the emphasis on that truism unduly minimizes the other, significant aspects of the allocation of a burden of proof. In addition to determining when the allocation will be dispositive, it also informs the parties of what precisely they have to prove. Furthermore, it provides a structure for the trial court regarding how to think about the case as it hears the evidence." (Emphasis omitted.) Id. Justice Borden further explained that, "[m]ost fundamentally, however, by the law establishing a burden of proof on a particular issue, it establishes what the law considers to be the presumed outcome of a particular type of case, and states the law's position on what is necessary to change that outcome. This process implicitly expresses the societal values involved in the particular type of litigation in question." Id., 442 (*Borden, J.*, concurring).

Similarly, I would conclude that adopting a presumption that reinstatement of guardianship is in the best interests of the child and allowing that presumption to be rebutted by a preponderance of the evidence appropriately expresses the societal values involved. Specifically, it demonstrates that society believes that a child's best interests are usually served by reinstatement of guardianship to the parent but allows that presumption to be rebutted when a preponderance of the evidence demonstrates that reinstatement of guardianship is not in the best interests of the child. Providing the parent with both the presumption and the clear and convincing standard focuses on the parent's rights

alone. On the other hand, a preponderance of the evidence standard fairly balances the value that society places on allowing families to remain intact with the interest of stability for a child whose guardianship has been placed in another individual for a period of time.

After evaluating each of the factors in the *Eldridge* balancing test, I would conclude that proof by a fair preponderance of the evidence is the correct standard to be applied in reinstatement of guardianship proceedings under § 45a-611. This standard most appropriately balances the issues involved in a reinstatement proceeding.

In the present case, the trial court correctly applied the fair preponderance of the evidence standard. On the basis of the evidence presented by the petitioner, the trial court found that, "by increasing Zakai's time in [the respondent's] care and having [overnight visits] in [the respondent's] home, Zakai feels less safe." The trial court further found that, after it increased overnight visitation, "the emotional and physical debilitation Zakai is now exhibiting is unacceptable." Finally, the court found that removing Zakai from the petitioner, with whom he has bonded, would be cruel and would inflict debilitating pain on him.

Accordingly, the trial court concluded that it was not in Zakai's best interests to return to the respondent's care. On the basis of these findings, I would agree with the trial court that the petitioner proved by a preponderance of the evidence that reinstatement of guardianship to the respondent was not in Zakai's best interests. I would agree with the Appellate Court that the respondent has failed to prove a constitutional violation and, accordingly, has not satisfied the third prong of *State* v. *Golding*, 213 Conn. 233, 240, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

I would, therefore, affirm the judgment of the Appellate Court.

[1] The respondent was also arrested in 2014 and charged with threatening and breach of the peace for an incident at a public park involving Zakai's maternal uncle and the petitioner. A criminal protective order was issued, barring any contact between the respondent and the petitioner.

[2] The majority relies on the fact that, at the time that the trial court issued its order in December, 2017, the trial court found that the respondent had ceased contact with Montreal for more than one year. Although I agree that the trial court made that finding in December, 2017, I disagree with the majority's implication that this was a fact in favor of reinstating guardianship. Montreal was charged with assaulting Zakai in 2014, and the conditions for visitation were that he not be at the house while Zakai was visiting. Nevertheless, the respondent allowed Montreal to be at the house during Zakai's visits and did not cease contact with him until March, 2016, approximately two years later. Therefore, the respondent continued having contact with Montreal for more than two years after he was charged with assaulting Zakai. The majority fails to note that, after making this observation, the court also found that "one of the remaining obstacles" was the respondent's choices, particularly as it relates to who cares for and has contact with Zakai. Instead of being a fact that weighs in favor of the respondent's reinstatement as guardian, as the majority posits, I would conclude that this fact demonstrates the respondent's difficulty in making decisions that are

in the best interests of Zakai. In fact, only approximately two months after being granted overnight visitation, the respondent had another unrelated male in her home in direct violation of the visitation order.

[3] The majority cites to *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 287–88, and provides a parenthetical stating that "only when 'serious physical illness or serious physical injury' or 'immediate physical danger' is present does 'the child's interest[s] no longer [coincide] with [those] of the parent, thereby diminishing the magnitude of the parent's right to family integrity . . . and therefore the state's intervention as parens patriae to protect the child becomes so necessary that it can be considered paramount' " This misconstrues this court's conclusion in *In re Juvenile Appeal (83-CD)*. The portion of the opinion to which the majority cites and quotes is a discussion of the statutory provision for summary temporary custody by the department under then General Statutes § 17a-38 (e). This court explained that, in the context of a statute that allows the department to take a child who lives with his or her parents into custody without a court order, "[i]ntervention is permitted only where 'serious physical illness or serious physical injury' is found or where 'immediate physical danger' is present. It is at this point that the child's interest no longer coincides with that of the parent, thereby diminishing the magnitude of the parent's right to family integrity . . . and therefore the state's intervention as parens patriae to protect the child becomes so necessary that it can be considered paramount." (Citation omitted.) *In re Juvenile Appeal (83-CD)*, supra, 287–88.

To the extent that the majority suggests that "serious physical illness," "serious physical injury" and "immediate physical danger" are *some* of the reasons why the interests of the child and the parent would diverge, I agree. These are certainly not the only circumstances under which those interests may diverge, and I do not believe *In re Juvenile Appeal (83-CD)* can be read that broadly. The majority tries to expand the court's comment on § 17a-38 (e) to be a statement that a child's interest can never diverge from the parent's interest in family integrity unless there is "serious physical illness or serious physical injury" or "immediate physical danger." That is simply not the issue that this court decided in *In re Juvenile Appeal (83-CD)*. That is the standard for determining whether the department can remove a child under an order of temporary custody. However, "serious physical illness," "serious physical injury" and "immediate physical danger" are certainly not the only reasons why the interests of the child and the parent may diverge. I need look no further than the circumstances of the present case, in which the child has been out of the respondent's care for the vast majority of his young life and feels unsafe in her care.

[4] The majority asserts that the heightened, clear and convincing standard is required in the present case because "[r]einstatement of guardianship proceedings employ the best interests of the child analysis . . . which leaves the reinstatement determination unusually open to the subjective assessment of the trial judge." (Citation omitted.) It is not clear to me how the clear and convincing standard counteracts the subjective assessments of the judge any more or less than the preponderance of the evidence standard. In any event, a trial court's determination of the best interests of the child is subject to review and must be sufficiently supported by factual findings.

[5] Although § 45a-611 (b) was the subject of technical amendments in 2018; see Public Acts 2018, No. 18-45, § 9; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, I refer to the current revision of the statute.

[6] By contrast, a parent may be permanently removed as guardian pursuant to General Statutes § 45a-616a. If a parent is removed pursuant to § 45a-616a, § 45a-611 (d) provides that the parent may not petition for reinstatement of guardianship rights. In light of the permanent nature contemplated by those proceedings, my conclusions and analysis in the present case are not applicable to proceedings originating under § 45a-616a.

[7] The facts of this case demonstrate why having a different standard for voluntary agreements to remove guardianship versus involuntary removal of guardianship would prove difficult. In the present case, although the petitioner and the respondent ultimately entered into an agreement to remove guardianship from the respondent and transfer it to the petitioner, the agreement came only after a lengthy and difficult, contested process. A review of the evidence reveals that, had the respondent not agreed to transfer guardianship, the court likely would have found that the conditions for removal of guardianship under § 45a-610 had been proven.

[8] I acknowledge that there are cases that the majority points to in which

some other states have applied the clear and convincing standard. See part II C of the majority opinion. Given that our legislature has expressed its intention that the best interests of the child be paramount; see General Statutes § 45a-605 (a) ("[t]he provisions of sections 45a-603 to 45a-622, inclusive, shall be liberally construed in the best interests of any minor child affected by them, provided the requirements of such sections are otherwise satisfied"); I would join the states that apply the preponderance of the evidence standard. I also believe that the preponderance of the evidence standard more evenly balances the scales between the rights of the parents and those of the child, particularly in light of the presumption.

———————————————